IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and CHARLES A. WHOBREY, | ) ) ) ) | |
| Plaintiffs and Counter-Defendants, | ) ) | |
| v. | ) ) | Case No. 17 CV 1770 |
| IVM, INCORPORATED, | ) ) ) | Judge Robert W. Gettleman |
| Defendant and Counter-Plaintiff. | ) | |
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and CHARLES A. WHOBREY, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 18 CV 3168 |
| IVM, INCORPORATED, and MARK A. HAIGHT, | ) ) ) | Judge Robert W. Gettleman |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Central States, Southeast and Southwest Areas Pension Fund ("the Fund") sued defendant IVM, Incorporated ("IVM") for contributions owed. 29 U.S.C. § 1145. IVM counterclaimed, seeking a refund for excess contributions. The Fund also sued IVM—and one of its two employees, Mark Haight ("Mark")—for withdrawing from a multiemployer pension plan. 29 U.S.C. § 1381.

All parties move for summary judgment. Because Mark's status as a covered employee is genuinely disputed, neither party is entitled to summary judgment on the Fund's contributions claim (17 CV 1770). That disputed fact also precludes summary judgment on the Fund's withdrawal claim (18 CV 3168). The Fund is nonetheless entitled to summary judgment on IVM's refund counterclaim (17 CV 1770). Although this court concludes that Mark's status as a covered employee is genuinely disputed, it was not arbitrary or capricious for the Fund's Board of Trustees to conclude otherwise.

## BACKGROUND

The facts are taken from the parties' L.R. 56.1 statements and from the affidavits, depositions and exhibits. Unless the court states otherwise, the facts are not genuinely disputed.

IVM has two employees: Jeannie Haight and her husband, Mark Haight. They sell monuments. Jeannie runs the office, keeps the books, and talks to customers and suppliers. Mark sells, engraves, and places monuments. He also loads them onto IVM's truck and delivers them to cemeteries.

IVM entered into a collective bargaining agreement ("CBA") with a union. For each IVM employee covered by the agreement, IVM promised to pay into the Fund. Under the CBA, "[a]ll truck driving" was in the union's jurisdiction.

IVM renewed the CBA in 2012 and 2014. The 2014 CBA expired in April 2016. But IVM had to keep paying into the Fund. Before the 2014 CBA expired, IVM and the union entered into a participation agreement. Under that participation agreement, IVM's obligation to pay into the Fund survived the CBA. That obligation continued until extinguished by "contract or statute."

The participation agreement—like the CBA—required IVM to pay into the Fund for each covered employee. "Driver[s]" were covered. Employees "employed in a managerial or supervisory capacity" were not.

IVM paid into the Fund on Mark's behalf for many years. This dispute arose in March 2016 when IVM stopped paying. In January 2017, ten months after IVM stopped paying, IVM sent the Fund a letter stating, "We . . . have no members and we desire to terminate participation in the Pension Fund."

Four months after IVM requested termination, IVM sent another letter. IVM asked the Fund to refund $63,400 in contributions. IVM argued that after December 30, 2009, Mark no longer "held a job described in the bargaining unit description of the Collective Bargaining Agreement." IVM's contributions after that date were thus "inappropriate." IVM stated that Mark was IVM's "sales manager"—he "saw to the engraving and placement of the monuments in the appropriate cemeteries." Mark also supervised his and Jeannie's two sons, Brian and Trevor, who worked for IVM "sporadically, on a part-time basis."

The Fund's Board of Trustees refused to refund IVM. The Board found that:

> Mark Haight's work before December 30, 2009 of "loading of monuments on [IVM's] truck and delivering the monuments," which IVM concedes was work that was covered by the CBAs, had to continue after December 30, 2009 and must be part of his duties as described in Jeannie Haight's statement of seeing to the placement of monuments.

> The contention that Mark Haight was ineligible because IVM employed his "two children sporadically, on a part-time basis during which time they were supervised by husband Mark" does not establish he was ineligible because the wage information provided by IVM reflected wages solely for one son (Brian) for 2013 through 2016. Thus, there were no employees to supervise prior to 2013 and there is no evidence that Brian performed any bargaining unit work.

> [T]he amounts paid to Brian reflect sporadic work, so at most Mark was only a supervisor on a sporadic basis beginning in 2013 because there was usually no one to supervise.
>
> The conclusion that Mark was covered by the CBAs is also supported by: . . . IVM's payment of contributions . . . through March 2016 . . . .

The Fund filed two suits: one against IVM for contributions owed (17 CV 1770), the other against IVM and Mark Haight for withdrawing from the Fund (18 CV 3168). IVM counterclaimed in the contributions case, seeking a refund.

## DISCUSSION

All parties move for summary judgment. Summary judgment is proper if no material fact is genuinely disputed and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250–51 (1986). The court draws all justifiable inferences in favor of the non-moving party. Id. at 255. For the following reasons, the court finds that Mark's status as a covered employee is genuinely disputed. Thus, neither party is entitled to summary judgment on the Fund's contributions and withdrawal claims. But because it was not arbitrary or capricious for the Fund's Board of Trustees to conclude that Mark was covered, the Fund is entitled to summary judgment on IVM's refund counterclaim.

## 1    Contributions claim

Employers that promise to pay into a multiemployer benefit plan must follow that plan's "terms and conditions." 29 U.S.C. § 1145. If the employer's promise to pay arose from a CBA, so too must the employer must follow that CBA's terms and conditions. Id. If the employer underpays, the plan's fiduciary may sue. 29 U.S.C. § 1132(g)(2).

The parties agree that IVM was bound by the participation agreement through April 27, 2017, and that IVM stopped paying into the Fund after March 26, 2016. IVM argues, however,

4

that it never had to pay because: (1) the participation agreement rested not on a CBA, but on a pre-hire agreement; and (2) under the participation agreement and CBAs, Mark Haight was not a covered employee.

IVM's first argument needs little discussion. Whether the CBA was a pre-hire agreement is irrelevant. Section 515 of ERISA requires employers to contribute "to the extent not inconsistent with law." 29 U.S.C. § 1145. Under section 515, an employer cannot escape liability by pointing to defects in the CBA's formation. Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc., 870 F.2d 1148, 1153 (7th Cir. 1989) (en banc) ("[N]othing in ERISA makes the obligation to contribute depend on the existence of a valid collective bargaining agreement . . . ."). Section 515 was added precisely because Congress sought to fix "problems that arose when employers repudiated pre-hire agreements and refused to make pension and welfare contributions." J.W. Peters, Inc. v. Bridge, Structural & Reinforcing Iron Workers, Local Union 1, AFL-CIO, 398 F.3d 967, 977 (7th Cir. 2005).

Whether Mark was a covered employee is a more complicated question. Under the participation agreement, a "Covered Employee" is an "employee covered by a collective bargaining agreement" that requires contributions to the Fund. What employees are "covered by" the CBA? Perhaps any employee who drives a truck: under the CBA, "[a]ll truck driving" is in the union's "jurisdiction."

Jurisdiction is a word that "readily bears" different meanings. Central States, Southeast and Southwest Areas Pension Fund v. Joe McClelland, Inc., 23 F.3d 1256, 1258 (7th Cir. 1994). Thankfully, the court need not construe its meaning—unlike the CBA, the participation agreement straightforwardly covers "driver[s]." And "[t]o the extent there exists any conflict" with the CBA, the participation agreement "shall control."

Not all drivers, however, are covered. The participation agreement excludes anyone "employed in a managerial or supervisory capacity." The issues are thus whether Mark was: (1) a "driver"; and (2) "employed in a managerial or supervisory capacity." The court concludes that both issues turn on genuinely disputed facts.

**1.1     Was Mark Haight a driver?**

The participation agreement does not define "driver." There is no dispute that Mark Haight drives for IVM. IVM nonetheless argues that Mark was not a covered employee because he drove rarely: in his affidavit, Mark states that the time he spends "delivering and setting monuments" is "less than three-tenths of one percent" of his "working time."

Under paragraph seven of the participation agreement, IVM had to contribute for all employees "covered by a collective bargaining agreement requiring contributions to the Fund[ ]." The participation agreement's introductory paragraph states that covered job classifications included "driver[s]." Section 8.1 of the CBA requires weekly payments for "each employee covered by this Agreement." Similarly, paragraph 2 of the participation agreement requires payments "for each Covered Employee."

The Seventh Circuit has interpreted somewhat similar language to include any employee who performs <u>some</u> covered work. <u>McCleskey v. DLF Construction, Inc.</u>, 689 F.3d 677, 680 (7th Cir. 2012). <u>McCleskey</u> involved an employer's obligation to pay for "each hour worked by employees covered" by a collective bargaining agreement. <u>Id.</u> at 680. "That language," the Seventh Circuit held, is "straightforward and plain." <u>Id.</u> at 679. An employee who "does bargaining unit work" is covered—and that covered employee need not do "<u>only</u> bargaining unit work." <u>Id.</u> at 680 (emphasis in original).

The Fund argues that <u>McCleskey</u> controls: the agreements here and in <u>McCleskey</u> classify employees as "covered" or "not covered," with nothing in between. Just as the cement mason in <u>McCleskey</u> was covered because he did <u>some</u> cement-related work, the Fund argues, so too is Mark covered because he did <u>some</u> truck driving. But the agreements in <u>McCleskey</u> were clearer: the participation agreement defined "the type of employee covered under the CBA." <u>Id.</u> Those covered employees included "Cement Mason, Plasterer and Shop Hand employees <u>doing bargaining unit work as described in the agreement</u>." <u>Id.</u> (emphasis in original). That language, according to the Seventh Circuit, "establish[es] that for an employee to be covered under the CBA, he or she must be an employee who does bargaining unit work; it does not limit the CBA's coverage to employees doing <u>only</u> bargaining unit work." <u>Id.</u>

In the instant case, there is no such language in the CBA or in the participation agreement. <u>McCleskey</u> would control if the participation agreement included all employees "doing bargaining unit work." It does not do so. Without that language, the question whether Mark was a "driver"—despite spending only a small fraction of his working time driving— involves genuinely disputed facts that cannot be resolved on summary judgment. Those disputed facts include: (1) what the Fund and IVM intended "driver" to mean; (2) the amount of driving that Mark did for IVM; and (3) whether that amount of driving qualifies Mark as a "driver," as defined by the Fund and IVM.

### 1.2      Was Mark Haight employed in a managerial or supervisory capacity?

Also genuinely disputed is whether Mark was "employed in a managerial or supervisory capacity." IVM argues that Mark was so employed, pointing to Mark's affidavit:

> My duties as Manager and Operator . . . are to sell monuments to families of deceased persons . . . . Customers pick out from promotional sources the style and type of monument they wish to acquire. I assist them in making that choice and presenting different descriptions of monuments to them. . . . I then order from the appropriate monument manufacturer, the monument with the appropriate engraving . . . . I then inspect the monument to make sure it conforms to the order and to the request of the purchaser with regard to engraving and condition of the monument itself. I then contact persons who will construct a concrete slab at the cemetery where the monument [is] to be placed and engage them to provide a concrete slab upon which the monument will be placed. Upon being notified that the slab has been completed, I will deliver the monument . . . .
>
> * * *
>
> The delivering and setting of the monuments are incidental to my duties as Manager and Operator . . . . My duties include supervision of other employees hired by the Company; however, the only such employees ever hired would be my sons, Brian and Trevor, on their summer vacation time. My sons would then deliver and install footings. I do have the authority to hire and fire employees if the business of the Company supports hiring employees.

Taking these statements from Mark's affidavit as true, was Mark "employed in a managerial or supervisory capacity"? The words alone do not supply the answer; they are ambiguous. A person employed in a "supervisory" capacity presumably supervises other employees. Perhaps it is enough that Mark supervised his sons during their summer vacations. Yet Mark's sons might have worked for only a few hours during those summers—it would be a stretch to call Mark a "supervisor" if his supervisory duties were so limited.

The word "managerial" is also ambiguous. A manager might manage people, operations, or the business as a whole. Mark might be a manager in that he manages his sons when they work for IVM during their summer vacations. He also seems to manage IVM's operations—at least in the sense that he comprises half of a two-employee company. The parties agree that Mark and Jeannie are IVM's only employees, and it is unclear whether Jeannie performs any

managerial work, especially in sales. Consequently, the evidence suggests that Mark necessarily carries out a significant amount of IVM's work.

Yet both parties—borrowing from a Supreme Court interpretation of labor law—suggest that a manager must "formulate and effectuate management policies by expressing and making operative decisions of their employer." NLRB v. Bell Aerospace Company Division of Textron, 416 U.S. 267, 286 (1974). Whether Mark formulated management policies is unclear. His affidavit suggests that he makes "operative decisions" for IVM in the sense that he seems to work with a fair amount of discretion. But that discretion, the parties agree, must be "independent of an employer's established policy." Illinois State Journal-Register, Inc. v. NLRB, 412 F.2d 37, 41 (7th Cir. 1969). Mark's affidavit indicates that he orders monuments from manufacturers, sells them to customers, and manages the sales function. He also inspects monuments, approves them, and delivers them to cemeteries for placement. Mark's affidavit does not, however, show that his discretion to perform any of those tasks was independent of IVM's established policy.

Because IVM and the Fund "suggest different, yet reasonable interpretations" of the terms "managerial or supervisory capacity," those terms are ambiguous. Central States, Southeast, Southwest Areas Pension Fund v. Kroger Co., 73 F.3d 727, 732 (7th Cir. 1996). The question thus becomes what IVM and the Fund intended. Central States, Southeast, Southwest Areas Pension Fund v. Kroger Co., 226 F.3d 903, 911 (7th Cir. 2000). To determine their intent, the court may look to extrinsic evidence. Moriarty v. Svec, 164 F.3d 323, 331–32 (7th Cir. 1998).

The Fund submitted evidence that IVM made payments on Mark's behalf for many years. But those payments do not show that whatever IVM intended "managerial or supervisory capacity" to mean, IVM intended to exclude Mark. Because the Fund's evidence is insufficient—

and because the parties have not otherwise briefed this issue—Mark's status as a manager or supervisor is another genuinely disputed fact that cannot be resolved on summary judgment.

**2        Refund counterclaim**

Just as a pension plan's fiduciary may sue for unpaid contributions, so too may an employer seek restitution for excess contributions. UIU Severance Pay Trust Fund v. Local Union No. 18-U, United Steelworkers of America, 998 F.2d 509, 512–13 (7th Cir. 1993). That is what IVM sought from the Fund's Board of Trustees: a refund for excess contributions.

The Fund's board denied that request. It concluded that IVM "ha[d] not identified a mistake that le[d] to the contribution payments." Among other things, the board found that: (1) IVM conceded that Mark's work was covered before 2009, and Mark continued to drive a truck for IVM after 2009; (2) Mark only supervised one son from 2013 through 2016, and that son only worked sporadically; (3) IVM continued to pay into the Fund on Mark's behalf through March 2016.

Because the board's decision was not arbitrary or capricious, the Fund is entitled to summary judgment on IVM refund counterclaim. Under the Fund's trust agreement, the Fund's trustees have "discretionary and final authority in making all [fund-related] decisions." This language gives the trustees wide discretion. The parties thus agree that this court reviews the board's refusal to refund IVM under an arbitrary and capricious standard. Under that standard, if the trustee "articulates an explanation" that is "satisfactory in light of the relevant facts," then "the trustee's decision is final." Exbom v. Central States, Southeast and Southwest Areas Health and Welfare Fund, 900 F.2d 1138, 1143 (7th Cir. 1990).

The board gave a satisfactory explanation for concluding that IVM's payments were not mistaken. First, there is no dispute that IVM conceded that Mark was covered before 2009 and

that Mark continued to drive a truck for IVM for some of the time after 2009. Second, as discussed, Mark arguably was not employed in a supervisory capacity merely because he occasionally supervised his son. Finally, it was reasonable for the board to consider IVM's history of paying into the Fund on Mark's behalf. Although this court concludes that Mark's status as a covered employee is genuinely disputed, it was not arbitrary and capricious for the board to conclude otherwise for purposes of IVM's refund claim.

**3      Withdrawal claim**

The Fund also sued IVM for withdrawing from the pension plan. Under the Multiemployer Pension Plan Amendments Act, an employer that withdraws from a multiemployer plan incurs withdrawal liability. 29 U.S.C. § 1381. The parties agree that IVM withdrew, but dispute whether IVM was an "employer" under 29 U.S.C. § 1381.

Because IVM's status as an employer under 29 U.S.C. § 1381 is genuinely disputed, both summary judgment motions are denied. "[A]n 'employer' for purposes of MPPAA liability is an entity that has assumed a contractual obligation to make contributions to a pension fund." Transpersonnel, Inc. v. Roadway Express, Inc., 422 F.3d 456, 460 (7th Cir. 2005). Whether IVM ever had a contractual obligation to pay into the Fund on Mark's behalf depends on whether Mark was ever a "covered employee." And whether Mark was ever a covered employee depends on if he was: (1) a driver; and (2) employed in a supervisory or managerial capacity. As discussed, both of those issues turn on genuinely disputed facts.

## CONCLUSION

For these reasons, the court grants summary judgment to Central States, Southeast and Southwest Areas Pension Fund on IVM, Incorporated's refund counterclaim. All other summary judgment motions are denied. In 17 CV 1770, [Doc. 71] is granted in part and [Doc. 76] is

11

denied. In 18 CV 3168, [Doc. 42] and [Doc. 47] are denied. Status hearing is set for March 10, 2020, at 9:00 a.m.

**ENTER:**      **February 18, 2020**

**Robert W. Gettleman**
**United States District Judge**